IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 13, 2022 Session

## STATE OF TENNESSEE v. KEVIN WAYNE NEWSON

**Appeal from the Criminal Court for Davidson County
No. 2019-C-1650, 2018-C-1871   Cheryl A. Blackburn, Judge**

_____

**No. M2021-00444-CCA-R3-CD**

_____

FILED
06/23/2022
Clerk of the
Appellate Courts

The Defendant, Kevin Wayne Newson, was convicted by a Davidson County Criminal Court jury of first degree premeditated murder, first degree felony murder, attempted first degree premeditated murder, employing a firearm during the commission of a dangerous felony, and convicted felon in possession of a firearm.  The trial court merged the first degree murder convictions and sentenced the Defendant to an effective term of life plus sixty years in the Tennessee Department of Correction.  On appeal, the Defendant challenges the sufficiency of the evidence, the trial court's sentencing determinations, the trial court's denial of the Defendant's request that the jury be instructed on aggravated assault resulting in death as a lesser-included offense of premeditated murder, the trial court's grant of the State's request that language regarding the Defendant's duty to retreat be included in the jury instruction on self-defense, and various other rulings of the trial court.  With respect to the self-defense instruction, the Defendant argues that duty to retreat language was prejudicially erroneous because the only criminal activity in which the Defendant was involved at the time of the shooting, *i.e*, being a convicted felon in possession of a firearm, had no nexus to the events that gave rise to the shooting.  Based on our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which J. ROSS DYER and JILL BARTEE AYERS, JJ., joined.

Manuel B. Russ, Nashville, Tennessee (on appeal) and William Conway, Nashville, Tennessee (at trial), for the appellant, Kevin Wayne Newson.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Megan King and Joe Clifton, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

According to the State's proof at trial, on the evening of May 4, 2018, the Defendant was standing with several other patrons, including Bryant Cureton, in the checkout line of a Nashville liquor store when he apparently became convinced that Mr. Cureton and two other store patrons were mocking him. The Defendant gave Mr. Cureton several hard stares while the two were together in the checkout line but neither man spoke to the other inside the store. The Defendant completed his purchase and exited the store. A moment later, Mr. Cureton completed his own purchase, exited the store, and started toward his vehicle, where his fiancée, Jacqueline Johnson, and their three young children were waiting. At about that time, a black four-door sedan pulled up to block Mr. Cureton's vehicle and the Defendant, who was in the front passenger seat, said in a hostile tone to Mr. Cureton, "N******, do I know you or something?" Mr. Cureton responded by asking the Defendant if the Defendant knew him and telling the Defendant to "get the f*** away" from him. At that point, the Defendant instructed the driver of his vehicle to hand him his "strap" or gun.

Concerned for his family, Mr. Cureton, who held a handgun carry permit and was armed, began rapidly walking across the parking lot away from his family's vehicle. The Defendant and his companion followed in their vehicle and stopped beside Mr. Cureton, who cursed at the Defendant and told him to get away. The shopping center's security guard heard the commotion, saw Mr. Cureton making motions as if to bring up a weapon, drew his own weapon, and ordered Mr. Cureton to raise his hands. Mr. Cureton complied. As the Defendant's vehicle slowly exited the parking lot, the Defendant fired five shots out of the passenger window at Mr. Cureton, who still had his arms raised in the air. The shots missed Mr. Cureton but struck and killed Ms. Johnson, who was standing beside the couple's vehicle sixty feet away.

The Defendant was indicted for the first degree premeditated murder of Ms. Johnson, the first degree felony murder of Ms. Johnson, the attempted first degree premeditated murder of Mr. Cureton, employing a firearm during the commission of a dangerous felony, and convicted felon in possession of a firearm. The State relied on the Defendant's attempted first degree premeditated murder of Mr. Cureton as the underlying felony for the felony murder and employing a firearm during the commission of a dangerous felony counts of the indictment.

At the Defendant's October 29-31, 2019 trial, Mr. Cureton testified that at approximately 8:45 p.m. on May 4, 2018, he stopped at the Discount Liquor Store on

Dickerson Pike in Nashville with Ms. Johnson and their three children: his two-week-old daughter; his two-year-old son; and his seven-year-old stepson. He said that he and his family had just returned from a visit with extended family in Indiana and that he had not been drinking that day. It was his birthday, however, and Ms. Johnson, who had been unable to drink alcohol during her pregnancy, told him that she would have a drink with him that night to celebrate.

Mr. Cureton testified that he left Ms. Johnson and the children outside in his vehicle and went into the store to purchase a half pint of Hennessy. He said he had a handgun carry permit and was wearing his gun in his waistband. There were three cash registers inside the store but one line of customers waiting on the next available cashier. As he stood in line, two young women behind him began making rude gestures to a man to their far left. A man Mr. Cureton later identified as the Defendant, who was in front of Mr. Cureton in the line, looked back and "gave . . . an eye" to both Mr. Cureton and the young women. Mr. Cureton speculated that the Defendant thought the young women were friends of Mr. Cureton and that they were mocking the Defendant. He stated that the Defendant gave him multiple additional intimidating stares, including as the Defendant was slowly walking out of the store. Mr. Cureton said that he did not know the Defendant, that neither he nor the Defendant said anything to each other inside the store, and that he tried to ignore the Defendant's stares.

Mr. Cureton testified that when he completed his purchase and left the store, he noticed a black, four-door sedan across the parking lot, which started toward him as he walked to his own vehicle where his family was waiting. He stated that Ms. Johnson was standing outside his vehicle holding their newborn child when the black sedan pulled up to block Mr. Cureton's vehicle. The driver's window lowered and the Defendant, who was in the passenger seat, said to him in an intimidating tone, "N*****, do I know you or something?"

Mr. Cureton, who explained that he felt "picked on" by the Defendant, testified that he responded to the Defendant, "Do I know you?" He stated that the driver of the vehicle was laughing but said nothing to him. The Defendant then asked the driver for a "strap," which Mr. Cureton knew was a slang word for a gun. At the same time, the Defendant was "[f]idgeting around like someone . . . reaching for something." As the car began slowly pulling away, he overheard the Defendant telling the driver to turn around in the parking lot.

Mr. Cureton testified that he did not want his car to be shot up with his children inside it, so he instructed Ms. Johnson to get in the driver's seat and leave and he began walking at a fast pace across the parking lot toward Broadmoor. When he had reached a small grassy patch of ground, the black sedan blocked him and the passenger window

lowered. Mr. Cureton stated that he cursed the Defendant, repeatedly telling him to "get the F out of here." He said he had his arms raised and was waving the Defendant off when he saw the Defendant lift a gun and begin firing. The Defendant was no more than ten to fifteen feet away and had the gun "aimed dead at [Mr. Cureton]" as he fired. Mr. Cureton could not recall how many times the Defendant fired but said it was "well over two or three shots."

Mr. Cureton testified that he never removed his own gun from his waistband and never told the Defendant that he had a gun. He said he could not have fired his own gun even had he wanted to because the shopping center's security guard had ordered him to raise his arms in the air. He agreed that he still had his arms raised above his head at the moment that the Defendant fired at him. He stated that he never saw the security guard point the guard's weapon at the Defendant or the Defendant's vehicle.

Mr. Cureton testified that when the Defendant started shooting at him, he "hit the ground with [his] hands still in the air and waited until the shots were done being fired." After the shooting stopped, he got up, turned around, and saw Ms. Johnson "laid out" on the ground behind Mr. Cureton's vehicle, which had not been moved. He said he ran to check on his children as the security guard was checking on Ms. Johnson. After he saw that the children were all right, he went back to Ms. Johnson. By that time, paramedics were arriving. He learned approximately four hours later that Ms. Johnson had died at the hospital.

Mr. Cureton testified that when he leaned into the front seat of his vehicle to check on his children, his gun fell out of his waistband onto the floorboard of the vehicle. He identified himself and the Defendant on the liquor store's surveillance video and explained that when his arm was underneath the front of his shirt inside the store, he was scratching himself because of his "bad eczema" that caused him to "scratch constantly."

On cross-examination, Mr. Cureton testified that he was not sure if he mentioned the Defendant's use of the "N-word" during his initial recorded police interview. He was confident, however, that he mentioned it to a police detective when he met with him at the scene the next day. He acknowledged that he probably had not mentioned the Defendant's use of the word during his preliminary hearing testimony and explained that to him the "important part" was the manner in which the Defendant asked him if he knew him. When shown a portion of the preliminary hearing transcript, he acknowledged that it reflected that he said he opened his car door before the Defendant and his companion pulled up to his vehicle. He stated, however, that the transcript must have been "reworded" because what he actually said was that the Defendant was pulling up to him at the moment that he reached his own vehicle.

- 4 -

Mr. Cureton testified that after the Defendant asked him in the rude tone if he knew him, he told the Defendant to "Get the F up out of here." He said it was at that point that the Defendant asked the driver of the vehicle for a firearm. He repeated that he never reached for his own gun and that he was waving the Defendant off when the Defendant started shooting at him. He denied that he threw his gun on the floorboard of his vehicle when he went to check on his children but conceded that he might have used the word "throw" during his interview with police. He testified that he checked on Ms. Johnson, whose blood "was squirting up everywhere[,]" before he went to the vehicle to check on his children. When asked if he told the detective that he had not checked on Ms. Johnson, he replied that he was not sure what he said at that time because he was still in a frantic state. He acknowledged that he responded to defense counsel's question at the preliminary hearing of whether he had a weapon on him that night by stating that he had one in his car. He denied the statement was a lie, testifying that it was truthful because his weapon was in his car when the police arrived on the scene.

On redirect examination, Mr. Cureton testified that he was interviewed by multiple police officers on the night of the shooting when he was still in a very emotional state. He agreed that he provided those officers with the same essential details that he recounted during his trial testimony, including that he had his gun on him when the Defendant started shooting.

On recross-examination, he testified that he never touched his gun after it fell onto the floorboard of his vehicle. He said the blood on the weapon came from his having checked on Ms. Johnson, whose blood was "shooting everywhere" from the gunshot wound in her neck.

Forrest Bradford, a career military veteran and a former federal police officer who was working as an armed guard at the shopping center on the night of the shooting, testified that he was in his vehicle dressed in his tactical vest with a security emblem and armed with his .45 caliber handgun and a back-up .45 caliber handgun when he heard two men arguing in the parking lot of the liquor store. When he got out of his vehicle, his attention was immediately focused on the individual that he initially believed to pose the threat, Mr. Cureton, who was "posturing in the fashion that he might be about to pull a weapon." He, therefore, drew his weapon, directed its laser onto Mr. Cureton's chest, and asked him to show him his hands. Mr. Cureton immediately put his hands up and told him that he did not have a gun. He walked up to Mr. Cureton, saw that he did not have a gun in the front of his sweatpants, brushed his back to check for a weapon, found nothing, and stepped back and lowered his gun to the "low ready" position. At some point, he holstered his weapon because he no longer believed that Mr. Cureton posed a threat.

Mr. Bradford testified that when he first approached, Mr. Cureton was standing on a grassy berm arguing with someone in a dark sedan that was pulled up slightly in front of Mr. Cureton with the driver's window up and the passenger side of the vehicle closest to Mr. Cureton. The vehicle was three to five feet from Mr. Cureton, but Mr. Bradford was unable to see inside it. Mr. Bradford testified that after he had checked Mr. Cureton for weapons and backed away, the vehicle began to move off slowly. As the vehicle "crested the corner shots started going off."

Mr. Bradford testified that he was at first unsure where the gunshots were originating but finally realized that they were coming from the vehicle. He said he was familiar from his combat experience with the "peculiar sound" made when gunshots "fly by" and that he heard rounds passing by him and Mr. Cureton. He stated that Mr. Cureton's hands were still in the air when the gunshots were fired. Mr. Cureton was not holding a gun, said nothing about having a gun, and was not talking to the vehicle's occupants when the shots were fired.

Mr. Bradford testified that the shots from the vehicle were fired as the vehicle was "cresting the turn onto Broadmoor[.]" Afterwards, the vehicle took off down Broadmoor, and Mr. Cureton looked to Mr. Bradford's left and said, "Man, my girl is hit." Mr. Bradford stated that Ms. Johnson was almost sixty feet from where he and Mr. Cureton had been standing when the shots were fired. He testified that he never fired either of his guns that night and never pointed his weapon at the Defendant's vehicle.

On cross-examination, he agreed that when he approached the grassy berm where Mr. Cureton was standing beside the Defendant's vehicle, Mr. Cureton was yelling aggressively, "jumping around," and putting his hands under his shirt. He described Mr. Cureton's actions as "posturing" or "building [him]self up to, maybe, do something." He acknowledged that he said in a statement to police that he re-holstered his weapon after he noticed that Ms. Johnson had been hit. He stated that his adrenaline was high at the time he gave his statement and he believed that he had already re-holstered his weapon before the shots were fired. Regardless, his weapon was either holstered or at a "low-ready" position.

Sagovia McKenzie, who testified that she had had a brief sexual relationship with the Defendant, identified text messages that she and the Defendant exchanged on the night of the shooting. She read aloud a text message the Defendant sent her on May 4, 2018, at 8:48 p.m. that read, "Man, I just got to shooting at somebody at the liquor store. Hold up baby, for real, for real, all my kids." The next day, the Defendant sent her a text message at 8:32 a.m. that read, "It was fun baby but I got to go."

Officer Randall Smith of the Metro Nashville Police Department, who responded to the shots fired call, testified that he took possession of Mr. Bradford's guns and ammunition, which he checked into the police property room, and retrieved surveillance video from the liquor store, which he turned over to a detective.

Danielle Connor, a civilian crime scene investigator with the Metro Nashville Police Department, testified that she collected into evidence five fired .40 caliber cartridge casings, which were found on the road, and a 9mm handgun, which was found on the floorboard of Mr. Cureton's vehicle. She said there was one round in the chamber and sixteen rounds in the magazine of the weapon. The safety lock was on, and the handle of the weapon appeared to have blood on it. She found no evidence of either a 9mm or a .45 caliber weapon having been fired at the scene. She identified photographs of the scene and of the evidence collected, including a photograph of a bullet strike to a silver Toyota Corolla and a bullet fragment found in the sofa of a beauty salon located next to the liquor store. She said she was aware that the Corolla was not parked at the location during the shooting because the driver informed her that he had been driving through the parking lot at the time the bullet struck his vehicle.

On cross-examination, she agreed that, from the photograph, there appeared to be dirt on the muzzle of the 9mm gun. She repeated that the silver Corolla was not parked at the shopping center at the time of the shooting. She did not remember the name of its driver and had not recorded his information.

Eddie Arfaee, an employee of an automobile dealership that had sold the Defendant a 2016 black Toyota Camry equipped with a GPS device, testified that he gave a detective with the Metro Nashville Police Department access to his login and password and showed him how to track the vehicle.

Metro Nashville Police Department Crime Laboratory forensic scientist Lisa Whitaker, an expert in firearm and toolmark identification who analyzed the weapons and ammunition involved in the case, testified that she determined that the five fired .40 caliber shell casings had all been fired from the same unknown weapon.

Kenjuante Williams, who said he was currently incarcerated on a probation violation, testified that on May 4, 2018, he was living with the Defendant; the Defendant's girlfriend, Laytoya Grady; and Ms. Grady's children. On the morning of May 5, 2018, Ms. Grady contacted Mr. Williams after he had dropped her off at her workplace and, sounding urgent, told him to drop everything and come immediately to get her. When he arrived to pick her up, Ms. Grady got into the driver's seat of the vehicle, drove home, hurriedly packed, gathered her children, and drove with him and the children to Antioch, where the

Defendant was waiting in his black Toyota Camry. After transferring her luggage to the Defendant's vehicle, she and the children got into the Camry with the Defendant and left.

Mr. Williams testified that Ms. Grady gave him a cell phone before she left. Later that day, the Defendant called him on the cell phone to tell him that someone would be contacting him with instructions on where to drop off a bag that the Defendant had left under the seat of the vehicle. When Mr. Williams looked, he found a nylon bag under the seat that contained one or possibly two guns. He said an individual contacted him and told him where to meet. When he reached that location, someone he did not know came to the vehicle, retrieved the bag, and left.

On cross-examination, Mr. Williams acknowledged that he was interviewed by Detective Harris. He denied that anyone promised him anything in exchange for his testimony, told him how to testify, or told him not to accept any plea deal until the instant case was concluded. When asked if he was hoping that he would be able to "go back in front of a judge and get out of jail," he replied, "No."

Detective Paul Harris of the Metro Nashville Police Department testified that he reviewed the surveillance video from the interior of the liquor store but was unable to locate any videos that showed the shooting itself. He said that Mr. Cureton identified the Defendant as the shooter from a screenshot of the liquor store surveillance video and that news stories containing the Defendant's photograph aired on local media within twenty-four hours of the shooting, which resulted in someone's identifying the Defendant by name. On May 7, 2018, he showed Mr. Cureton a photographic lineup containing the Defendant's photograph. Mr. Cureton, visibly crying, made a positive identification of the Defendant as the shooter from that photographic lineup, circling the Defendant's photograph and writing, "He killed my girlfriend. He pulled his gun out and I saw him shoot."

Detective Harris testified that he took out a warrant for the Defendant's arrest, tracked him through his Toyota Camry's GPS device to Bastrop County, Texas, where the Defendant was arrested, and on May 10, 2018, drove to Texas to pick up the Defendant's vehicle from an impound lot. He identified various items collected from the vehicle, including a Nashville Taco Bell receipt for a purchase made at 12:03 a.m. on May 5, 2018, and a Brinkley, Arkansas Kentucky Fried Chicken receipt for a purchase made at 1:37 p.m. the same day. He also identified surveillance video from a Texarkana, Arkansas Wal-Mart store that showed that the Defendant purchased cell phones and prepaid cell phone minutes at the store on May 5, 2018, at 4:51 p.m.; surveillance video from the Nashville Taco Bell that showed that the Defendant drove through the store's drive through line, parked, and let Sagovia McKenzie out of the passenger seat of the vehicle; and surveillance video from Ms. McKenzie's housing complex that showed that shortly after the shooting the Defendant and Ms. McKenzie were together at Ms. McKenzie's housing complex. Based on the GPS

- 8 -

data, Detective Harris learned that the Defendant's Toyota Camry was parked near Ms. McKenzie's residence at the time of the shooting.

On June 7, 2018, Detective Harris interviewed Ms. McKenzie, who showed him text messages sent to her from the Defendant. He identified a number of text messages sent from the phones associated with the Defendant, including one sent on May 5, 2018, at 4:12 p.m. that stated, "I didn't tell her that it's more like I have to get out of Dodge type, SHT" and another sent at 4:13 p.m. the same day that stated, "It was fun while it lasted."

On cross-examination, Detective Harris testified that he might have asked Mr. Kenjuante Williams if he would be willing to testify but he did not coach him on what to say. He also denied that he made him any promises in exchange for Mr. Williams' testimony, stating that he had no promises to make. He said he was never able to determine the vehicle involved in the shooting.

Detective Joseph High of the Metro Nashville Police Department's surveillance and investigative unit, an expert in the law enforcement use of call detail records, testified about how he was able to determine the Defendant's and Ms. Grady's approximate locations based on which cell phone towers transmitted the signals from their phones.

Detective Randy McMillian of the Bastrop County, Texas Sheriff's Department testified that he participated in the May 8, 2018, arrest of the Defendant from a black Toyota Camry located at a duplex in Elgin, Texas, and obtained a search warrant for the vehicle.

Lyndsi Delarosa, supervisor of the trace evidence section for the Texas Department of Public Safety Crime Laboratory, testified that she found a number of items, including four cell phones, when she processed the Defendant's vehicle on May 11, 2018.

Dr. Tom Deering, the forensic pathologist who performed the autopsy of Ms. Johnson's body, testified that the cause of death was a gunshot wound to the victim's neck, which, among other things, damaged her left internal carotid artery.

As his first proof, the Defendant entered an agreed stipulation that the transcript of the preliminary hearing was a true, accurate, and complete transcript prepared to the best of the ability of a licensed court reporter for the State of Tennessee.

Detective Jesse Holt testified that he had reviewed his audio recording of his interview with Mr. Forrest Bradford and that at no time during the interview did Mr. Bradford state "that he patted down and cleared Bryant Cureton prior to the shooting." On

cross-examination, he acknowledged that Mr. Bradford told him that he had "cleared Mr. Cureton for safety."

The Defendant testified that he was in the checkout line of the liquor store when he noticed Mr. Cureton staring at him. He said he glanced at Mr. Cureton but then glanced away. He then heard a commotion caused by two women who were being rude to some man and glanced at the women, but he did not pay them much attention. As he was leaving the store, Mr. Cureton walked "awfully close" to him, and he looked at Mr. Cureton again because he was trying to determine if he knew him. Once outside, he got in his vehicle and talked for a moment with the driver before he and his companion began exiting the parking lot. As they were driving off, he noticed Mr. Cureton exiting the store, told his companion to stop for a moment beside Mr. Cureton and to roll down the window, and asked Mr. Cureton in a polite tone, "Excuse me, do you know me?"

The Defendant testified that Mr. Cureton responded in a rude tone, "Do I know you? Get the f*** out of here. Get the f*** out of here, with all that." The Defendant stated that he never asked for or grabbed a gun inside the car and that the driver never said anything. He said he told his companion, "[W]e're not on that, let's go on and continue with our night, and go ahead and pull off." He testified that Mr. Cureton was initially standing outside his vehicle with the car door open but then leaned into the vehicle and spoke to someone inside. As the Defendant and the Defendant's companion were pulling off, the Defendant saw Mr. Cureton appear to retrieve something from inside the vehicle.

The Defendant testified that there was a vehicle in front of their vehicle, which forced his companion to drive slowly as they were exiting the parking lot. He said he looked out the passenger window and saw that Mr. Cureton was following them. He stated that his companion asked him what to do and that he told him to keep driving. Mr. Cureton, however, who was acting in an aggressive manner, ran past their vehicle, met them at the exit, said, "[Y]'all need to get the f*** out of here, y'all don't want this" and began repeatedly reaching under his shirt. At about that point, the Defendant's companion told the Defendant that there was "a dude" with a gun. The Defendant said that when he looked again at Mr. Cureton, Mr. Cureton had "upped a pistol." The Defendant then said to his companion, "[O]h sh**, he got a gun, too[,]" and in a "reflex" action ducked down, grabbed a gun from the floorboard of the vehicle, put his hand out the window, and began firing without aiming.

The Defendant testified that he had no intention of shooting anyone and did not know that he had struck someone until he saw the news reports the next morning. He said he panicked and fled to Texas with Ms. Grady and her children because he had been to prison in the past and feared going back. He testified that he had been convicted of aggravated burglary and two counts of robbery on February 23, 2006.

On cross-examination, the Defendant acknowledged that he had also been convicted of theft of property on October 25, 2010. He said the vehicle used in the shooting belonged to the driver, Christopher, whose last name he did not know. He agreed that Christopher blocked Mr. Cureton's vehicle when he pulled up beside Mr. Cureton outside the liquor store. The Defendant insisted, however, that he used a polite tone when he asked Mr. Cureton if he knew him and that he was not angered by Mr. Cureton's response. He denied that he asked Christopher to hand him his "strap" or that he and Mr. Cureton argued. He said he never saw Mr. Bradford. He denied that Mr. Cureton had his arms raised at the time he started firing his gun out the passenger window and said that both Mr. Cureton and Mr. Bradford lied in their testimony. He stated that he was in fear for his life at the time he started shooting, but he denied that he aimed his gun at Mr. Cureton or intended to hit anyone with the four or five rounds that he fired.

Following deliberations, the jury convicted the Defendant of the indicted offenses. The trial court subsequently sentenced the Defendant to an effective term of life plus sixty years in the Tennessee Department of Correction and overruled his motion for a new trial. Thereafter, the Defendant filed an appeal to this court in which he identifies the following ten issues for our review: (1) whether the trial court erred in charging the jury relating to self-defense and lesser included-offenses; (2) whether the trial court erred in permitting the jury to view items in the jury room that were not admitted into evidence; (3) whether the trial court erred in allowing the State to impeach the Defendant with improper 609 evidence; (4) whether the trial court erred in limiting the Defendant's cross-examination of State's witnesses; (5) whether the trial court erred in restricting voir dire; (6) whether the prosecutor engaged in improper closing argument; (7) whether the trial court permitted perjured testimony; (8) whether the evidence was sufficient to sustain the Defendant's convictions for first degree murder, attempted first degree murder and employing a firearm during the commission of a dangerous felony; (9) whether the trial court erred in allowing testimony about the bullet strike on the Toyota Corolla; and (10) whether the trial court erred in ordering consecutive sentences.

## ANALYSIS
## I. Jury Instructions

As his first issue, the Defendant contends that the trial court erred in denying his request that the jury be instructed on aggravated assault resulting in death as a lesser-included offense of first degree premediated murder, in removing the "no duty to retreat language" from the self-defense instruction based on the Defendant's status as a felon in possession of a firearm, and in granting the State's request that the following language be added to the instruction on self-defense:

- 11 -

The defendant had a duty to retreat before using deadly force. A duty to retreat means he was obligated to employ all means in is power, consistent with his own safety, to avoid danger and to avert the necessity of taking the alleged victim's life.

It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001) (citations omitted). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)).

An erroneous jury instruction may deprive the defendant of his constitutional right to a jury trial. *State v. Garrison*, 40 S.W.3d 426, 433-34 (Tenn. 2000). As part of their instructions in criminal cases, trial courts must describe and define each element of the offense or offenses charged. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). An instruction will be considered prejudicially erroneous only if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. *Id.* (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)). "Whether jury instructions are sufficient is a question of law appellate courts review de novo with no presumption of correctness."

## A. Self-Defense

The Defendant contends that the trial court erred in determining that the Defendant was engaged by virtue of his illegal possession of the gun in the type of unlawful activity "that would negate the complete instruction related to the duty to retreat." In support, he relies on *State v. Tyshon Booker*, No. E2018-01439-CCA-R3-CD, 2020 WL 1697367, at * 44 (Tenn. Crim. App. Apr. 8, 2020), *perm. app. granted* (Tenn. June 8, 2020), in which a panel of this court concluded that "a causal nexus between a defendant's unlawful activity and his or her need to engage in self-defense is necessary before the trial court can instruct the jury that the defendant had a duty to retreat[,]" and that "status offenses, such as the *Booker* defendant's illegal possession of a handgun as a minor, "will rarely qualify as unlawful activity because a person's status alone cannot provoke, cause, or produce a situation." *Id.* at 27.

The State responds that the Defendant waived review of this claim because the Defendant "never raised a nexus issue with the [trial] court, but instead explicitly agreed with the trial court that he was not entitled to possess a weapon and that 'no duty to retreat' should be removed from the charge." The State further argues that the Defendant is not entitled to plain error review because he cannot show that a clear and unequivocal rule of

law was breached, that he did not waive the issue for tactical reasons, or that review is required to do substantial justice. We agree with the State.

To be entitled to relief under the doctrine of plain error, the Defendant has the burden to establish the presence of the following five factors: (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the issue was not waived for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020) (citations omitted). "'Moreover, the error must have been of 'sufficient magnitude that it probably changed the outcome of the trial.'" *Id.* (quoting *State v. Banks*, 271 S.W.3d 90, 119 (Tenn. 2008)).

At the time of the offense, Tennessee Code Annotated section 39-11-611(b)(2) provided as follows:

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity[1] and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b) (Supp. 2017).

The trial court relied on *State v. Perrier*, 536 S.W.3d 388, 403 (Tenn. 2017), in its decision to remove the no duty to retreat language from the charge. In *Perrier*, our supreme court held that the trial court, as part of its threshold determination of whether to charge self-defense,

should decide whether to charge the jury that a defendant did not have a duty to retreat. As part of that decision, the trial court should consider whether the State has produced clear and convincing evidence that the defendant was

---

[1] This portion of the statute now reads "not engaged in conduct that would constitute a felony or Class A misdemeanor . . ." Tenn. Code Ann. § 39-11-611(b)(2) (2021).

- 13 -

engaged in unlawful activity such that the "no duty to retreat" instruction would not apply.

*Id.* at 403. The *Perrier* Court further held that a defendant's possession of a firearm as a convicted felon was encompassed within the "unlawful activity" contemplated by the statute.

The *Perrier* Court found it unnecessary in that case to address whether the unlawful activity by a defendant had to have a causal nexus to the defendant's perceived need to defend himself. *Id.* at 404. As mentioned above, a panel of this court subsequently held in *Booker,* on which the Defendant relies, that there must be a causal nexus "between a defendant's unlawful activity and his or her need to engage in self-defense" and that "status offenses" "will rarely qualify as unlawful activity because a person's status alone cannot provoke, cause, or produce a situation." *Booker*, 2020 WL 1697367, at * 26. However, as noted by the trial court in its extensive analysis of this issue in its written order overruling the Defendant's motion for new trial, *Booker* is not controlling and other panels of this court have not followed the same analysis. *See e.g. State v. Sales*, No. M2017-01116-CCA-R3-CD, 2020 WL 5568621, at *15 (Tenn. Crim. App. Sept. 17, 2020) ("We note that the Tennessee Supreme Court recently clarified that being a felon in possession of a weapon means that the felon has a duty to retreat before engaging in self-defense, but it does not mean that the felon can never use a weapon for self-defense. [The] Defendant's illegal possession of a gun triggered his duty to retreat but did not preclude him from acting in self-defense [.]" (citation omitted)), *perm app denied* (Tenn. Jan. 13, 2021).

As such, we agree with the State that the Defendant cannot show that a clear and unequivocal rule of law was violated. We further agree with the State that the *Booker* Court's observation that a defendant's status will rarely "produce a situation" does not apply under the facts in this case, in which Ms. Johnson would still be alive were it not for the fact that the Defendant, a convicted felon, was in possession of a weapon that night. We also agree that defense counsel's argument in closing that the Defendant was attempting to leave but was blocked by another vehicle suggests that defense counsel may have waived any objection for tactical reasons. We, therefore, conclude that the Defendant is not entitled to relief on the basis of this issue.

## B. Instruction on Defendant's Duty to Retreat

The Defendant contends that the trial court committed prejudicial error by granting the State's requested special instruction on the Defendant's duty to retreat. The Defendant argues that inclusion of the requested language deviated from both the pattern jury instruction and that the clear instruction provided by the *Perrier* Court, was not an accurate statement of Tennessee law, and improperly shifted the burden of proving self-defense to

the Defendant. The State disagrees, citing *State v. Eddie Smith*, No. W2018-01509-CCA-R3-CD, 2020 WL 3572071, at \*16 (Tenn. Crim. App. June 30, 2020), *perm. app. denied* (Tenn. Dec. 3, 2020), which noted that almost identical language was "a correct statement of the law[.]" We agree with the State.

As an initial matter, we note that pattern jury instructions are not controlling. *See State v. James*, 315 S.W.3d, 440, 446 (Tenn. 2010) ("Trial courts are not limited to the mere recitation of the pattern instructions.") (citation omitted); *State v. Hodges*, 944 S.W.2d 346, 354 (Tenn. 1997) ("[P]attern jury instructions are not officially approved by this Court or by the General Assembly and should be used only after careful analysis. They are merely patterns or suggestions.").

In *Smith*, we rejected a defendant's similar argument about the trial court's inclusion of common law language on a defendant's duty to retreat, finding that it was a correct statement of the law when a defendant does not fall within one of the self-defense statute's enumerated circumstances in which an individual does not have a duty to retreat. We wrote:

> As recognized by our supreme court in *Perrier*, when the General Assembly codified the law on self-defense in 1989, it included a provision that eliminated the duty to retreat that had been recognized in common law, including in the statute that "'[t]here is no duty to retreat before a person threatens or uses force.'" *Perrier*, 536 S.W.3d at 397 (quoting T.C.A. § 39-11-611(a) (1989)). In 2007, the General Assembly re-wrote the statute to provide that a defendant had no duty to retreat only in certain circumstances. *See* T.C.A. § 39-11-611(b); *Perrier*, 536 S.W.3d at 397-98. Thus, logic dictates that the defendant would have a duty to retreat if he or she did not fall within those enumerated circumstances. Furthermore, the trial court analyzed the defendant's argument in *Perrier* that the legislature did not intend for the possession, display, or employment of handguns to be the unlawful activity that would require a defendant to retreat before using defensive force by applying principles set forth under the common law duty to retreat. *Perrier*, 536 S.W.3d at 404. In recognizing that "a duty to retreat does not mean that a person cannot defend herself or himself," the trail court applied the principle from common law that a duty retreat required "'that the slayer must have employed all means in his power, consistent with his own safety, to avoid danger and avert the necessity of taking another's life.'" *Id.* (quoting [*State v.*] *McCray*, 512 S.W.2d [263,] 265 [Tenn. 1974)]). We note that this is the exact language that the trial court used in its instruction. The instruction was a correct statement of the law, and, therefore, the Defendant is not entitled to relief regarding this issue.

*Id.* at *16.

We, likewise, conclude that the instruction was a correct statement of the law under the facts of this case and that the Defendant is not entitled to relief on the basis of this issue.

## C. Aggravated Assault Resulting in Death

The Defendant contends that the trial court erred in refusing his request that the jury be instructed on aggravated assault resulting in death as a lesser-included offense. He asserts that aggravated assault resulting in death is a lesser-included offense of first degree premeditated murder, that the facts supported the instruction, and that the jury would have likely returned a verdict on such had it been presented with the option. The State argues that the Defendant waived review of this issue for failing to make the request in writing. In the alternative, the State argues that the trial court appropriately concluded that aggravated assault resulting in death was not a lesser-included offense to any of the indicted offenses in the case because it contained different elements.

We agree with the State that the Defendant has waived appellate review of this issue for failing to submit the requested instruction in writing. *See* Tenn. Code Ann. § 40-18-110(c) ("Notwithstanding any other provision of the law to the contrary, when the defendant fails to request the instruction of a lesser included offense as required by this section, the lesser included offense instruction is waived. Absent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as ground for relief in either a motion for new trial or on appeal."); *see State v. Page*, 184 S.W.3d 223, 229 (Tenn. 2006) (holding that a failure to instruct on lesser included offenses "is subject to waiver for purposes of plenary appellate review when the issue is not timely raised and properly preserved.").

We, further, agree with the State that the Defendant cannot show the existence of plain error. We, therefore, conclude that the Defendant is not entitled to relief on the basis of this issue.

## II. Viewing of Mr. Cureton's Firearm

The Defendant somewhat disingenuously frames his next issue as whether the "trial court erred when it permitted the jury to view items in the jury room that had not been admitted into evidence during the State's case." Specifically, the Defendant complains about the trial court's having responded to the jury's request to see Mr. Cureton's gun by permitting a court officer to take the weapon, which was admitted as a closed boxed exhibit, to the jury room to be removed from its box and viewed by the jurors. When the box containing Mr. Cureton's pistol was admitted into evidence the Defendant did not lodge an

objection or voice any concern about the enclosed pistol. Since no objection was lodged, the Defendant argues that the trial court's handling of the jury's request rose to the level of plain error, asserting that he was deprived of his right to a fair trial and an impartial jury by the trial court's *ex parte* communication with the jury, as well as by the trial court's "[m]ore egregious act of permitting its officer to enter the jury room to assist the jurors in their review of the gun in a state that was different from that in which it was admitted into evidence, and to remain in the jury room during deliberations." The Defendant further asserts that the jury's viewing of the gun, which had been cleaned prior to forensic testing, undercut the defense theory that Mr. Cureton was in possession of the gun during the shooting. The State argues that the Defendant cannot show that a clear and unequivocal rule of law was broken, that a substantial right of his was affected, that he did not waive the issue for tactical reasons, and that consideration of the alleged error is necessary to do substantial justice.

In its written order overruling the Defendant's motion for new trial, the trial court noted that a court officer had informed the trial court of the jury's request to see Mr. Cureton's firearm and that the trial court had, pursuant to Rule 30.1 of the Tennessee Rules of Criminal Procedure, allowed the court officer to open the box to enable the jurors to view the weapon in the presence of the court officer. After the viewing, the court officer exited the jury room before the jurors resumed their deliberations.

We agree with the State that the Defendant cannot show the existence of plain error in the trial court's handling of this matter. The jury was entitled to view the gun, which was properly admitted as an exhibit without objection by the Defendant. *See* Tenn. R. Crim. P. 30.1 ("Unless for good cause the court determines otherwise, the jury shall take to the jury room for examination during deliberations all exhibits and writings, except depositions, that have been received into evidence."). Because of the potentially dangerous nature of the exhibit, the trial court acted appropriately and within its authority in setting limits on the manner in which the jury viewed the weapon. *See id.*, *Advisory Comm'n Comments*.

Before the jury returned with its verdicts, the trial court informed the parties of the jury's request and the manner in which the jury had viewed the weapon, without any objection raised by the Defendant. The better practice would have been for the trial court, prior to the jury's viewing of the weapon, to call the parties back to the courtroom to inform them on the record of the jury's request and the trial court's intended action. "To prevent even the appearance of judicial partiality or unfairness, any proceeding involving the jury after it has retired for deliberations should be conducted in open court and in the defendant's presence." *State v. Art Mayse*, No. M2004-03077-CCA-R3-CD, 2006 WL 1132082, at *8 (Tenn. Crim. App. Apr. 27, 2006) (citing *State v. Tune*, 872 S.W.2d 922,

929 (Tenn. Crim. App. 1993); *Smith v. State*, 566 S.W.2d 553-559-60 (Tenn. Crim. App. 1978)).

The Defendant cannot, however, show that he suffered any prejudice by the jury's ex parte communication via the court officer with the trial court or by the court officer's display of the gun to the jury. *See Tommy Dale Adams v. State*, No. M2018-00470-CCA-R3-PC, 2019 WL 69999719, at \*28 (Tenn. Crim. App. Dec. 20, 2019) (observing that prejudice to a defendant occurs only when there is a reasonable possibility that ex parte communication between a judge and jury influenced the jury's verdict). Contrary to the Defendant's assertion, the State's position at trial was not that Mr. Cureton did not have the gun during the shooting, but instead that he never displayed or brandished the weapon at the Defendant. Moreover, as noted by the trial court, the jury saw and heard evidence at trial of the blood and dirt that were on the gun and defense counsel argued that point in closing. We, therefore, conclude that the Defendant is not entitled to relief on the basis of this issue.

### III. Impeachment of Defendant with Prior Convictions

The Defendant next contends that the trial court erred in allowing the State to impeach his credibility with improper evidence under Tennessee Rule of Evidence 609.

A conviction may be used to impeach the testimony of an accused in a criminal prosecution if the following four conditions are satisfied: (1) the conviction is for a crime punishable by death or imprisonment in excess of one year, or the conviction is for a misdemeanor which involved dishonesty or false statement; (2) less than ten years has elapsed between the date the accused was released from confinement and the commencement of the subject prosecution; (3) the State gives reasonable pretrial written notice of the particular conviction or convictions it intends to use as impeachment; and (4) the trial court concludes that the probative value of the prior conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues. Tenn. R. Evid. 609; *State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999).

Two factors should be considered when deciding whether the probative value of a prior conviction outweighs its unfair prejudicial effect. *Mixon*, 983 S.W.2d at 674. First, "[a] trial court should . . . analyze the relevance the impeaching conviction has to the issue of credibility." *Id.* (citation omitted). Second, if the trial court finds that the prior conviction is probative of the defendant's credibility, then the court should "'assess the similarity between the crime on trial and the crime underlying the impeaching conviction.'" *Id.* (quoting Neil P. Cohen et al., *Tennessee Law of Evidence* § 609.9 at 376 (3d ed. 1995)). The more similar the impeaching conviction is to the offense for which the defendant is on trial, the greater the risk of a prejudicial effect to the defendant. *Id.*

- 18 -

This court reviews a trial court's ruling on the admissibility of prior convictions for impeachment purposes under an abuse of discretion standard. *See State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003).

We find no abuse of discretion in the trial court's ruling in this matter. After considering several proposed prior convictions, the trial court ruled that some were inadmissible due to age and similarity to the offenses for which the Defendant was on trial but that the Defendant's convictions for two counts of robbery and one count of aggravated burglary were probative on the issue of his credibility and would be admissible for impeachment purposes should the Defendant elect to testify.

The Defendant argues on appeal that the trial court erred in allowing the State to impeach him with his aggravated robbery conviction because the probative value of that conviction on the issue of his credibility was outweighed by the danger that the jury would consider it as propensity evidence of the Defendant's character for violence. The Defendant, however, was not impeached with his prior conviction for aggravated robbery. The record, in fact, reflects that the trial court, in allowing the robbery convictions for impeachment purposes, specifically noted that the convictions were for robbery rather than aggravated robbery. We, therefore, conclude that the Defendant is not entitled to relief on the basis of this issue.

## IV. Restriction of Cross-Examination

The Defendant next contends that the trial court improperly restricted his cross-examination of State's witnesses. Specifically, he complains that the trial court: "repeatedly and erroneously instructed defense counsel . . . that he was cross-examining Mr. Bryant Cureton improperly"; "erroneously curtailed [the Defendant's] cross-examination of Mr. Forrest Bradford by preventing [defense] counsel from referencing Mr. Bradford's prior expressed opinions related to [the Defendant's] claim of self-defense"; and "erroneously restricted [defense] counsel's ability to demonstrate the prior inconsistent statement of Mr. Kenjuante Williams through the testimony of Detective Paul Harris[.]" The Defendant argues that the cumulative effect of these various rulings resulted in a deprivation of the Defendant's Sixth Amendment right to confront witnesses against him. The State responds by arguing that the Defendant, who failed to preserve his objections at trial, cannot show the existence of plain error. We agree with the State.

The record reflects that, during cross-examination of Mr. Cureton, defense counsel attempted to read aloud portions of Mr. Cureton's police interviews and preliminary hearing testimony to show discrepancies in his previous accounts of the shooting. The court interrupted to instruct defense counsel on the proper way to ask his questions and defense counsel proceeded according to the trial court's instructions, eliciting concessions

from Mr. Cureton about how his trial testimony differed from his previous accounts in several details.

During his cross-examination of Mr. Bradford, defense counsel attempted to elicit information about what Mr. Bradford had said to the Defendant's private investigator regarding the Defendant's claim of self-defense. During the bench conference that followed the State's hearsay objection, defense counsel stated that he wanted to demonstrate Mr. Bradford's bias by asking about his having told the investigator that the Defendant would be "going down" if he claimed self-defense. The trial court then held a jury-out hearing, at which Mr. Bradford testified that, based on his experience, "there was no self-defense" because no one was pointing a gun at the Defendant and his life was not in danger. At that point, defense counsel informed the trial court that he believed they were getting into testimony that would be improper for the jury to hear and that he was withdrawing his request to question Mr. Bradford about his conversation with the investigator.

Before his cross-examination of Mr. Williams began, defense counsel sought guidance from the trial court on the extent to which he could question Mr. Williams about promises made by the police for Mr. Williams' cooperation in the Defendant's case. The trial court informed defense counsel that he could ask Mr. Williams if he had been promised anything in exchange for his testimony, and if so, what he had been promised. The trial court also informed defense counsel that he could ask Detective Harris the same question during his cross-examination. Defense counsel did not object to the trial court's limitation on what he could ask the witnesses and subsequently asked the suggested questions of both witnesses.

After Detective Harris responded on cross-examination that he had made no promises to Mr. Williams, defense counsel pushed Detective Harris to admit that he told Mr. Williams during his interview that if Mr. Williams testified in the Defendant's case, "the next thing you know your case may be dropped." In the sidebar that followed the State's objection, defense counsel stated that he had a recording of the interview in which the detective made that statement. When asked which witness he was trying to impeach with the statement, defense counsel responded that it was both of them and that he could pull up the statement on the tape.

When the trial court expressed its desire to hear the portion of the recording in which Detective Harris promised Mr. Williams that his case would be dismissed in exchange for his cooperation, defense counsel conceded that Detective Harris merely implied that Mr. Williams' case might be dismissed. The trial court informed defense counsel that he could ask Detective Harris if he had implied that Mr. Williams might receive favorable treatment. Defense counsel then asked the question before the jury, to which Detective Harris

- 20 -

responded that "it was definitely suggested that this could help him," but "there was no promise made for anything in particular."

The Defendant's confrontation rights were not violated by the trial court's requiring defense counsel to adhere to the proper methods for impeaching a witness with a prior inconsistent statement or by the trial court's not allowing defense counsel to elicit hearsay from witnesses absent a recognized exception to the hearsay rules. We agree with the State that the Defendant cannot show that a clear and unequivocal rule of law was breached, that a substantial right was violated, that he did not waive the issue for tactical reasons, or that consideration of the alleged error is necessary to do substantial justice. We, therefore, conclude that the Defendant is not entitled to relief on the basis of this issue.

## V. Limitation of Voir Dire

The Defendant next contends that the trial court improperly restricted voir dire, thereby violating his constitutional rights to an impartial jury and a fair trial. Specifically, he challenges the trial court's ruling limiting the extent to which he could question the venire members about their feelings about self-defense. The trial court ruled that defense counsel could ask the venire members about whether they believed that individuals have a right to self-defense and whether they would follow the trial court's instructions on the self-defense law, but that he could not question them about the "no duty to retreat" concept. The State argues that the trial court properly exercised its discretion because the Defendant's proposed line of questioning "did not go to the issue of bias" but instead "amounted to arguing his case before the venire."

A defendant's right to an impartial jury is guaranteed by both the United States and the Tennessee Constitutions. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "'The impartial jury guaranteed by constitutional provisions is one which is of impartial frame of mind at the beginning of trial, is influenced only by legal and competent evidence produced during trial, and bases its verdict upon evidence connecting defendant with the commission of the crime charged.'" *State v. Hugueley*, 185 S.W. 3d 356, 377-78 (Tenn. 2006) (quoting *State v. Lawson*, 794 S.W.2d 363, 367 (Tenn. Crim. App. 1990)). "The ultimate goal of voir dire is to see that jurors are competent, unbiased, and impartial." *State v. Howell*, 868 S.W. 2d 238, 247 (Tenn. 1993). We review a trial court's decisions regarding voir dire and the qualifications of jurors under an abuse of discretion standard. *See id.* at 248 (concluding that "trial court did not abuse its discretion in refusing to allow individual voir dire of prospective jurors with respect to the content of pretrial news reports to which they had been exposed.").

The record reflects that defense counsel expressed his desire to question the venire about the circumstances in which an individual is allowed to use self-defense, stating that

his "example was going to be in a fight, do you have to wait until you actually get hit until you are allowed to hit someone else [.]" The trial court, after noting that the purpose of voir dire was "to find out if these jurors will give [the Defendant] a fair trial" and not to go into the specifics of the case, ruled that those questions were too detailed, especially under the circumstances, in which it was as yet unclear whether the facts would support a self-defense instruction.

We find no abuse of discretion in the trial court's ruling. We, therefore, conclude that the Defendant is not entitled to relief on the basis of this issue.

## VI. Closing Argument

The Defendant next contends that the trial court erred by permitting prosecutorial misconduct during closing argument. The Defendant asserts that "[t]he State was permitted to mischaracterize evidence, misstate witnesses' testimony, . . . mislead the jury about the evidence adduced at trial" and to "inject[] issues broader than the guilt or innocence of the accused by discussing his incentive in the trial to be untruthful." In support, the Defendant cites the prosecutor's statement in rebuttal that "All those inconsistencies show you he's not a credible witness[,]" and the prosecutor's argument that the Defendant's version of having fired without looking was inconsistent with the physical evidence that showed where three of the bullets had landed in a beauty salon, on the Toyota that was passing through the parking lot, and in the victim's body. The State points out that the Defendant did not object at trial and argues that the Defendant cannot show the existence of plain error.

We, again, agree with the State. Our review of the closing argument does not reveal any egregious misstatement of the facts or improper commentary on the evidence. The Defendant cannot show that a clear and unequivocal rule of law was breached, that a substantial right of his was affected, that he did not waive the issue for tactical reasons, or that consideration of the alleged error is necessary to do substantial justice. *See Vance,* 596 S.W.2d at 254.. We, therefore, conclude that the Defendant is not entitled to relief on the basis of this issue.

## VII. Perjurious Testimony

The Defendant next contends that the trial court erred by permitting what he characterizes as the clearly perjurious testimony of Mr. Williams without taking any remedial measures or instructing the jury regarding the testimony. In his amended motion for new trial and at the hearing on the motion, the Defendant asserted that Mr. Williams, who was incarcerated on a probation violation at the time of the Defendant's trial, "committed perjury when he testified he had no agreements with the State about being

released from custody and that he did not expect to get any benefits from testifying" because he was released from custody thirty-three days after his testimony on a petition to suspend that was not opposed by the State.

The Defendant presented no evidence to establish that Mr. Williams committed perjury at the hearing on his motion for new trial, much less during the trial itself, when the trial court would have had the opportunity to take remedial action. The Defendant's assertion that Mr. Williams lied is pure speculation based on the fact that Mr. Williams was released from custody without opposition by the State soon after the trial concluded. We, therefore, conclude that the Defendant is not entitled to relief on the basis of this issue.

## VIII.  Sufficiency of the Evidence

The Defendant next contends that the evidence was insufficient to sustain his convictions for first degree premeditated and felony murder, attempted first degree premeditated murder, and employing a firearm during the commission of a dangerous felony. Specifically, the Defendant argues that there was insufficient proof of the essential element of premeditation in each of the above convictions. In support, he cites, among other things, evidence that he made no declarations of his intent to kill Mr. Cureton, that he was already armed and did not procure a weapon for the purpose of killing Mr. Cureton, that Mr. Cureton was armed, that the killing was not particularly cruel, that he made no preparations to conceal the shooting before it occurred, and that he was not calm after the shooting. The State argues that the evidence was sufficient for the jury to find the existence of premeditation. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); s*ee also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of

demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

### A. Premeditated Murder and Attempted Premeditated Murder

The Defendant was convicted of the first degree premeditated murder of Ms. Johnson and the attempted first degree premeditated murder of Mr. Cureton. For the purposes of this case, first degree premeditated murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. §39-13-202 (2014 & 2018). Criminal Attempt occurs when a person who, "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" *Id.* at § 39-12-101(a).

Premeditation requires that the act be "done after the exercise of reflection and judgment" and committed when the accused "was sufficiently free from excitement and passion as to be capable of premeditation." *Id.* at § 39-13-202(d). Whether premeditation exists is a factual question for the jury to determine from all the evidence, including the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Our supreme court has provided a non-exclusive list of factors from which a jury may infer premeditation, including the defendant's declarations of an intent to kill, evidence of the procurement of a weapon, the defendant's use of a weapon on an unarmed victim, the particular cruelty of the killing, evidence of the infliction of multiple wounds, the defendant's preparation before the killing to conceal the crime, destruction or secretion of evidence after the killing, and the defendant's calmness immediately after the killing. *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000). Additional evidence from which a jury may infer premeditation is establishment of a motive for the killing. *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

Viewed in the light most favorable to the State, the evidence established that the Defendant, apparently convinced that Mr. Cureton was mocking him, gave Mr. Cureton several hard stares inside the liquor store, waited for him to emerge from the store, had his companion block Mr. Cureton's vehicle while he asked Mr. Cureton in a hostile tone if he knew him, asked his companion to hand him his gun after Mr. Cureton cursed him and told

him to get away, blocked Mr. Cureton's exit from the parking lot, and then fired five shots directly at Mr. Cureton, who had his hands raised in the air and was not holding his gun, before fleeing the scene with his companion. The evidence further established that one of the shots that the Defendant intended for Mr. Cureton struck and killed Ms. Johnson.

From all this evidence, a rational jury could have reasonably found that the Defendant premeditated the shooting, that he intended to kill Mr. Cureton, and that his actions caused the death of Ms. Johnson. The fact that Ms. Johnson was not the Defendant's intended victim does not mean that the jury could not find him guilty of her first degree premeditated murder. *Millen v. State*, 988 S.W.2d 164, 168 (Tenn. 1999) ("In short, if the evidence demonstrates that the defendant intended to 'cause the result,' the death of a person, and that he did so with premeditation and deliberation, then the killing of another, even if not the intended victim (i.e. intended result), is first degree murder."). We, therefore, conclude that the evidence was sufficient to sustain the Defendant's convictions for the first degree premeditated murder of Ms. Johnson and the attempted first degree premeditated murder of Mr. Cureton.

## B. First Degree Felony Murder

The Defendant was also convicted of the first degree felony murder of Ms. Johnson. For the purposes of this case, first degree felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder[.]" Tenn. Code Ann. § 39-13-202(a)(2) (2014 & 2018). Thus, to sustain the conviction, the State had to prove beyond a reasonable doubt that the Defendant killed Ms. Johnson during his attempt to commit the first degree premeditated murder of Mr. Cureton. As we have previously discussed, there was sufficient evidence from which a rational jury could reasonably find that the Defendant killed Ms. Johnson during his attempt to commit the first degree premeditated murder of Mr. Cureton. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for first degree felony murder.

## C. Employing a Firearm During the Commission of a Dangerous Felony

The Defendant was convicted of employing a firearm during the commission of a dangerous felony, which in this case was the attempted first degree premeditated murder of Mr. Cureton. *See* Tenn. Code Ann. § 39-17-1324(b)(1), (i)(1)(A) (2014 & 2018). The Defendant once again argues that there was insufficient evidence that he acted with premeditation. We disagree. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction.

### IX.  Testimony about Bullet Strike to Vehicle

The Defendant next contends that the trial court erred in allowing the State to present evidence about the bullet strike to the Toyota through Ms. Conner, who had no personal knowledge of how the damage occurred to the vehicle.  He argues that "Ms. Conner did not know how or when the 'bullet defect' in the unrelated vehicle occurred and to permit her to testify without restriction created the prejudicial impression to the jury that [the Defendant's] gunfire on that occasion was reckless and untargeted, undermining his later defense of self-defense."

The admissibility of evidence generally lies within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record.  *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).  "An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is illogical or unreasonable and causes an injustice to the party complaining." *Lewis*, 235 S.W. 3d at 141 (internal quotation and citation omitted).

Before Ms. Conner's testimony, the trial court held a jury-out hearing to consider the Defendant's objection to the admission of evidence of the bullet strike to the Toyota.  At its conclusion, the trial court ruled that it would allow the testimony and noted that the Defendant could argue against the weight the jury should give the evidence.

We find no abuse of discretion in the trial court's allowing the testimony.  As the State points out, testimony that one of the bullets struck a random vehicle in the parking lot arguably helped, rather than hurt, the Defendant's case because it supported his account that he fired four or five bullets without aiming as he was exiting the parking lot.  In any event, defense counsel was able to highlight to the jury the fact that Ms. Conner's only information about where the vehicle was located at the time of the shooting came from the driver of the vehicle, whose name she had not recorded and who was not a witness at trial. We, therefore, conclude that the Defendant is not entitled to relief on the basis of this issue.

### X.  Sentencing

The Defendant claims that his effective sentence of life plus sixty years is excessive because the trial court misapplied enhancement factors and improperly ordered consecutive sentencing.  The State argues that the trial court properly sentenced the Defendant.  We conclude that the Defendant's sentence is not excessive.

At sentencing, Lamarcus Childrous testified that he was Ms. Johnson's older brother and that he drove from Illinois to speak at the sentencing hearing.  He acknowledged that

- 26 -

Ms. Johnson's death had affected him emotionally and explained that she slept in bed with him from the time she was a newborn baby, that he was both a father and a brother to her, and that he even bought her clothes to wear for her first job. Ms. Johnson had six children, the youngest of which was born on April 17, 2018, and the "paternal side" of the children was not involved in their lives. Mr. Childrous said her death had affected many people.

The trial court allowed Mr. Childrous to read aloud a text message written by Ms. Johnson's oldest son, who was thirteen years old. In the text message, the child described his mother as trusting, caring, and forgiving and said that she "would have never done any harm to anyone in the way that she was harmed." The child also said that his mother's life had been "robbed from her and us alike" and that her death had been particularly difficult for his younger brother, who witnessed the shooting.

The State introduced the Defendant's presentence report into evidence. The report reflected that the thirty-five-year-old Defendant was not married but that he had been in a relationship with his girlfriend for nine years. The Defendant said in the report that he and his girlfriend had a two-year-old daughter and that he had a sixteen-year-old daughter from a previous relationship. The Defendant reported that he dropped out of high school during the tenth grade but that he completed a program to obtain his GED in 2007 and completed the Design for Living program in 2012. He said that he began using alcohol and marijuana when he was fourteen years old but that he was not addicted to alcohol and had not used marijuana since 2011. He also said that he began using oxycodone and Ecstasy when he was seventeen or eighteen years old but that he had not used Ecstasy since 2004 and last used oxycodone prior to his arrest in this case. According to the Defendant, he completed a residential drug abuse program while he was in the Davidson County Jail. Regarding employment, the Defendant stated that he was employed by Kentucky Fried Chicken at the time of his arrest in this case and that he had worked there about six months. Prior to working for Kentucky Fried Chicken, he worked full time as a cook at another restaurant. However, he left that job because he needed to reduce his work hours to enroll in college.

The report showed the following criminal history for the Defendant: A 2010 conviction of misdemeanor theft; a 2010 conviction of possession of a firearm during the commission of a dangerous felony while having a prior felony conviction; a 2009 conviction of misdemeanor drug possession; a 2003 conviction of convicted felon in possession of a weapon; a 2003 conviction of reckless endangerment involving a deadly weapon; and a 2002 misdemeanor conviction of gambling. The report also showed that the Defendant received a four-year sentence to be served on probation for his 2010 conviction of possession of a firearm but that he violated probation and was ordered to serve the balance of his sentence in confinement and complete a residential drug abuse program.

The Defendant's Strong-R assessment classified his overall risk to reoffend as moderate. The assessment concluded that he had high needs relevant to "Education"; moderate needs relevant to "Aggression," "Alcohol/Drug Use," and "Residential"; and low needs relevant to "Friends," "Attitudes/Behaviors," "Mental Health," and "Employment."

The trial court noted that the State filed a notice of enhanced punishment before trial and that the following five convictions in the notice were missing from the Defendant's presentence report: a 2012 federal conviction of possession of crack cocaine with intent to distribute, a 2006 conviction of possession of less than one-half gram of a Schedule II controlled substance with intent to sell, and 2006 convictions for one count of aggravated burglary and two counts of robbery. The State advised the trial court that the Defendant was on supervised probation for the federal drug conviction when he committed the offenses in this case and introduced into evidence documentation showing he was on supervised probation.

The trial court sentenced the Defendant to life for each of his murder convictions and merged the conviction of first degree felony murder into the conviction of first degree premeditated murder. For his remaining convictions, the trial court found that he was a Range III, persistent offender. The trial court noted that the mandatory sentence for employing a firearm during the commission of a dangerous felony, a Class C felony, was ten years and that the Defendant was statutorily required to serve the sentence at one hundred percent and consecutive to the sentence for attempted first degree murder. *See* Tenn. Code Ann. § 39-17-1324(e)(1), (h)(2). The trial court then found that the following enhancement factors applied to the Defendant's convictions of attempted first degree murder and convicted felon in possession of a weapon: the Defendant had a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range; the Defendant was a leader in the commission of an offense involving two or more criminal actors; the Defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; and at the time the felony was committed, the Defendant was on some form of judicially ordered release. Tenn. Code Ann. § 40-35-114(1), (2), (8), (13)(F). The trial court further found that the enhancement factor for employing a firearm during the commission of the offense applied to the Defendant's conviction of attempted first degree murder. Tenn. Code Ann. § 40-35-114(9). The trial court found that no mitigating factors were applicable.

The trial court noted that the Defendant's range of punishment for attempted first degree murder, a Class A felony, was forty to sixty years and sentenced him to fifty years. *See* Tenn. Code Ann. § 40-35-112(c)(1). The trial court noted that the range of punishment for the Defendant's conviction of convicted felon in possession of a firearm, a Class B felony, was twenty to thirty years and sentenced him to twenty-five years. *See* Tenn. Code Ann. § 40-35-112(c)(2).

In addressing consecutive sentencing, the trial court found that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. Tenn. Code Ann. § 40-35-115(b)(4). The trial court also found that the Defendant was being sentenced for an offense committed while on probation. *See* Tenn. Code Ann. § 40-35-115(b)(6). Accordingly, the trial court ordered that he serve the fifty-year sentence for attempted first degree murder and the corresponding ten-year sentence for employing a firearm during the commission of a dangerous felony consecutive to the life sentence for a total effective sentence of life plus sixty years.

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012); *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013) (applying the *Bise* standard of review to consecutive sentencing). In determining a defendant's sentence, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Defendant in his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. Tenn. Code Ann. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98. The burden is on the Defendant to demonstrate the impropriety of his sentences. *See* Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory factors are advisory only. *See* Tenn. Code Ann. § 40-35-114; *see also Bise*, 380 S.W.3d at 701; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id.* at 346.

Initially, we note that the State argues we must review the Defendant's sentencing issues for plain error because he did not contest the applicability of enhancement factors or consecutive sentencing at his sentencing hearing and did not raise the issues in his motion for new trial. However, a defendant ordinarily is not required to preserve sentencing issues by including them in a motion for new trial. *State v. Draper*, 800 S.W.2d 489, 497 (Tenn. Crim. App. 1990). Moreover, although the Defendant did not contest the application of enhancement factors or consecutive sentencing at his sentencing hearing, this court can choose to address sentencing issues on the merits. *See State v. Terry Newsom*, No. W2020-00695-CCA-R3-CD, 2021 WL 3138640, at *6 (Tenn. Crim. App. July 26, 2021), (no perm. app. filed). We choose to do so in this case.

First, the Defendant claims that the trial court erred by applying enhancement factor (2), that he was a leader in the commission of an offense involving two or more criminal actors, because the State did not present any proof that the driver of the black sedan in which the Defendant was riding participated in the offenses. We disagree with the Defendant.

In order to apply enhancement factor (2), there must be proof of some other person for the defendant "to lead." *State v. Alexander*, 957 S.W.2d 1, 6 (Tenn. Crim. App. 1997). In this case, the proof at trial showed that after the Defendant exited the store, he got into the passenger side of the black sedan. Mr. Cureton came out of the store, and the driver of the black sedan pulled up to block Mr. Cureton's vehicle. The driver then lowered the driver's window so that the Defendant could speak with Mr. Cureton. The Defendant told the driver, who was laughing, to hand him a gun, and the driver did so. The driver of the black sedan pulled away from Mr. Cureton's vehicle, but the Defendant told the driver to turn the sedan around in the parking lot, and the driver again did as the Defendant instructed. Alarmed, Mr. Cureton began walking away from his children for their safety, but the driver of the black sedan used the car to block Mr. Cureton. The Defendant lowered his passenger window, aimed the gun at Mr. Cureton, and fired multiple gunshots as the

driver of the black sedan slowly exited the parking lot.

In finding enhancement factor (2) applicable, the trial court explained,

When you look at the testimony, first of all, you have the video of him going into the market, but when he gets outside, he gets into another car. There is this sort of, I guess I wouldn't necessarily call it a confrontation, there was where he rolls down the window and asked don't I know you, and then Mr. Cureton testified that he heard him say "hand me the strap", because Mr. Newson was not the driver of the vehicle, he was in the passenger side, and he asked that of the driver, who drove away with him. So Factor No. 2 is made out by the record.

We agree with the trial court that the proof showed that more than one criminal actor participated in the shooting. Therefore, the trial court did not err by applying enhancement factor (2) to the Defendant's convictions.

The Defendant also contends that the trial court's application of enhancement factor (8), that before trial or sentencing, he failed to comply with the conditions of a sentence involving release into the community, and the trial court's application of enhancement factor (13)(F), that he was on some form of judicially ordered release when the felonies were committed, punished him twice for the same fact. However, the sentencing hearing transcript shows that the trial court applied enhancement factor (8) because the Defendant violated probation that was imposed for his 2010 conviction of possession of a firearm and applied enhancement factor (13)(F) because he was on supervised probation for his federal drug conviction when he committed the offenses in this case. Thus, the trial court did not err by applying enhancement factors (8) and (13)(F) to his convictions.

In a similar argument, the Defendant contends that the trial court erred by applying enhancement factor (9), that he employed a firearm during the commission of the offense, to his conviction of attempted first degree murder. Tenn. Code Ann. § 40-35-114(9). He asserts that by doing so, when he was statutorily required to serve his ten-year sentence for employing a firearm during the commission of a dangerous felony consecutive to the fifty-year sentence for attempted first degree murder, the trial court punished him twice for the same conduct of employing a firearm. The State argues that the trial court properly applied enhancement factor (9) because use of a firearm is not an element of first degree murder.

Count four of the indictment charged the Defendant with employing a firearm during the commission of a dangerous felony and specified that the dangerous felony was attempted first degree murder. This court has held that a trial court should not apply enhancement factor (9) to a conviction of attempted murder when the defendant also was

indicted for and convicted of employing a firearm during the commission of the attempted murder. *State v. Brian Hervery*, No. W2010-00675-CCA-R3-CD, 2011 WL 1225725, at *9 (Tenn. Crim. App. Mar. 31, 2011). Therefore, the trial court erred by applying enhancement factor (9) to the Defendant's conviction of attempted first degree murder.

Although the trial court misapplied enhancement factor (9) to the Defendant's conviction of attempted first degree murder, the trial court properly applied enhancement factors (1), (2), (8), and (13)(F) to his convictions of attempted first degree murder and convicted felon in possession of a firearm. Accordingly, the trial court did not abuse its discretion by enhancing his sentences to the midpoint in the range for each of those convictions.

Finally, the Defendant claims that the trial court erred by ordering consecutive sentencing based on his being a dangerous offender pursuant to Tennessee Code Annotated section 40-35-115(b)(4) because the offenses themselves were inherently dangerous. We note that the trial court also ordered consecutive sentencing based on the Defendant's being sentenced for an offense committed while on probation pursuant to Tennessee Code Annotated section 40-35-115(b)(6). The Defendant does not contest that finding, and that basis alone justified the trial court's ordering him to serve the fifty-year sentence for attempted first degree murder and the ten-year sentence for employing a firearm during the commission of a dangerous felony consecutive to his life sentence for first degree murder. *See State v. Mickens*, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003) (stating that because the criteria in Tennessee Code Annotated section 40-35-115(b) are listed in the alternative, only one needs to exist to impose consecutive sentencing).

In any event, when a trial court finds that a defendant is a dangerous offender, the trial court must find that "an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995). Trial courts must make specific findings regarding these two *Wilkerson* factors before imposing consecutive sentences. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

In finding that the Defendant was a dangerous offender, the trial court stated as follows:

> When relying on the dangerous offender, I need to go further and determine whether or not the consecutive sentences are based on a finding that the defendant is found to be a dangerous offender and that the aggregate term reasonably relates to the severity of the offenses and is necessary in order to protect the public from further serious criminal conduct by the defendant. And I think, when you look at the facts of this case and his prior

record, that that is certainly borne out about it being necessary to protect the public. He has a history with the federal officials that came after he had, in 2006, possession with the intent to sell. That would be a Schedule 2 substance. We've had aggravated burglary, two counts of robbery, and then he proceeds to pick up charges in the federal district and he's on release from that when he engages in this. First of all, he has a weapon, which he is not allowed to possess. He's in a -- Well, he has access to. He goes into a liquor store and we saw, and that was visual, people he does not know, someone he did not know, go out and then gets into a situation where he thinks somebody has looked at him wrongly or whatever the situation was, but he asks for a strap, they go down, the man starts running away so that, according to Mr. Cureton's testimony, so that he can protect his wife and children who are still in the car where he was next to, and he shoots back, which goes straight through Ms. Johnson's neck. And she dies, totally innocent of anything or any involvement whatsoever. But Mr. Newson thought it was okay to start firing on someone where other people are around, and now we have Ms. Johnson deceased for no reason whatsoever.

All of that, the number of times he's been convicted, the fact that he's on federal release, tells the court that it is necessary to protect the public from further serious conduct of the defendant. Therefore, the fifty years and then the ten years with that, which is sixty years, is going to be consecutive to his life sentence.

Here, the trial court specifically mentioned the *Wilkerson* factors and specifically found that consecutive sentencing was necessary to protect the public from the Defendant. Although the trial court did not specifically say consecutive sentencing reasonably related to the severity of the offenses, the trial court's comments, particularly that the Defendant "thought it was okay to start firing on someone where other people are around" and that Ms. Johnson's death was "for no reason whatsoever," demonstrate the trial court found that *Wilkerson* factor as well. Accordingly, we conclude that the trial court did not abuse its discretion by ordering consecutive sentencing and that the Defendant's effective sentence of life plus sixty years is not excessive.

## CONCLUSION

Based on our review, we affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE

- 33 -